UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff, | )<br>)<br>) |
| v. | )   Civil Action No.<br>) |
| 67 RUSH STREET, SOMERVILLE,<br>MASSACHUSETTS,<br>Defendant. | )   04 CV 10767 RWZ<br>)<br>)   MJ Bowler |

## VERIFIED COMPLAINT FOR FORFEITURE IN REM

The United States of America, by its attorney, Michael J.
Sullivan, United States Attorney for the District of
Massachusetts, in a civil action of forfeiture pursuant to Title
21, United States Code, Sections 881(a)(6) and 881(a)(7), alleges
that:

1.  This Court has jurisdiction in this matter pursuant to
28 U.S.C. §§ 1345, 1355, and 1356.  Venue is appropriate pursuant
to 28 U.S.C. § 1395.

2.  The in rem Defendant Property is now, and, during the
pendency of this action, will be within the jurisdiction of this
Court.

3.  The Defendant Property consists of the real property,
including all buildings and appurtenances, located at 67 Rush
Street, Somerville, Massachusetts.

4.  As detailed in the Affidavit of Massachusetts State
Police Trooper Brian P. Connors and the Affidavit of United
States Drug Enforcement Administration Special Agent James F.
O'Hara II, which are attached hereto as Exhibits A and B

respectively, and incorporated herein by reference, the United States has probable cause to believe that the Defendant Property constitutes real property used to facilitate illegal drug transactions and/or was purchased and/or improved through the proceeds accrued from drug activities.

5.   The Defendant Property is, therefore, subject to seizure and forfeiture to the United States of America, pursuant to 21 U.S.C. Sections 881(a)(6) and 881(a)(7).

WHEREFORE, the United States of America prays:

1.   That a warrant and monition, in the form submitted herewith, be issued to the United States Marshal for the District of Massachusetts commanding him to give notice to all interested parties to appear and show cause why the forfeiture should not be decreed;

2.   That judgment of forfeiture be decreed against the Defendant Property;

3.   That thereafter, the Defendant Property be disposed of according to law; and

4.  For costs and all other relief to which the United

States may be entitled.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: _Shelbey D. Wright_____

SHELBEY D. WRIGHT
Assistant U.S. Attorney
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100

Date: April 15, 2004

## VERIFICATION

I, James F. O'Hara II, Special Agent, United States Drug

Enforcement Administration, state that I have read the foregoing

Verified Complaint for Forfeiture In Rem and the Affidavits,

attached as Exhibits A and B, and that the contents thereof are

true to the best of my knowledge, information and belief.

_____

James F. O'Hara II, Special Agent
United States Drug Enforcement
Administration

Dated: April 13, 2004

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.                                              Boston

Then personally appeared before me the above-named James F.
O'Hara II, Special Agent, United States Drug Enforcement
Administration, who acknowledged the foregoing to be true to the
best of his knowledge, information, and belief, on behalf of the
United States of America.

Subscribed to and sworn to before me this ___13th___ day of
April, 2004.

_Lisa J. Talbot_
Notary Public
My commission expires: 5/29/09

LISA J. TALBOT
Notary Public
Commonwealth of Massachusetts
My Commission Expires
May 29, 2009

## EXHIBIT A

## AFFIDAVIT OF TROOPER BRIAN P. CONNORS

I, Brian P. Connors, being duly sworn, state the following:

1.    I, Brian P. Connors, am a Trooper in the Massachusetts State Police ("MSP") and have been so employed since October of 1992.  I am currently assigned to the Narcotics and Special Investigations Unit of the Attorney General's Office and have been so assigned since January of 1999.  Prior to that, from February of 1995 to January of 1999, I was assigned to the Narcotics and Special Investigations Unit of the Middlesex County District Attorney's Office.  Prior to my enlistment with the MSP, I was employed as a police officer for the Boston College Police Department for approximately six years, attaining the rank of detective sergeant.  In addition to my Municipal and State Police Academy training and annual in-service training, which I attend, I have completed over six hundred hours of specialized training, the majority of which has been in areas of criminal investigation.  Included in this training is an eighty hour course in drug enforcement and investigation sponsored by the United States Drug Enforcement Administration ("DEA"), an eighty hour course in drug enforcement and investigation sponsored by the Massachusetts Criminal Justice Training Council, and a forty hour course in criminal and drug investigations sponsored by the Narcotic Enforcement Officer's Association.  This training

1

consists of the identification of controlled substances; methods, means, paraphernalia, customs and practices of persons involved in the illegal use, sale, manufacture, trafficking and cultivation of controlled substances; financial investigations as they pertain to drug traffickers; search and seizure law and the preparation of affidavits for search warrants; and numerous other topics pertaining to the investigation of violations of the controlled substance laws. I have also attended training relative to the use of electronic surveillance equipment sponsored by the National Technical Investigator's Association, of which I am a member. In addition to my formal training, I have also participated in approximately ten prolonged narcotics investigations involving the use of court authorized electronic surveillance. Of those ten, I was the affiant/co-affiant on two court authorized electronic surveillances. Those cases resulted in the arrests of dozens of narcotic distributors, several of whom are currently serving lengthy prison sentences. These cases also resulted in the seizure of narcotics including cocaine, marijuana, ecstasy, oxycodone/oxycontin pills, and steroids. I have also received informal training from experienced narcotics investigators while engaged in cooperative investigations with federal, state, and municipal law enforcement agencies.

2.    Throughout my career in law enforcement, I have participated in over three hundred arrests for violations of the

2

Controlled Substances Act (Massachusetts General Laws Chapter 94C). The investigations which led to these arrests utilized such investigative techniques as undercover purchases by police officers, executions of search warrants, so-called buy-busts, and electronic interceptions of wire and oral communications. I have also worked in an undercover capacity in which I have purchased illegal controlled substances. During this training and experience, I have observed numerous types of controlled substances and am familiar with the paraphernalia associated with these substances and the manner in which they are commonly packaged and distributed. I am also familiar with the prices charged for controlled substances and also with the jargon associated with their sale and use. I have also become familiar with many of the methods, practices and techniques employed by persons involved in the distribution of controlled substances to acquire, store, and distribute drugs, as well as many of the methods utilized by these persons to protect their activities from detection by law enforcement officers.

3.    During my police career, I have also become familiar with, and have utilized, many of the so-called "normal investigative procedures" used by law enforcement officers to identify, apprehend, and successfully prosecute persons involved in the distribution of controlled substances. These "normal investigative procedures" include, but are not limited to,

3

physical surveillance; telephone toll analysis; public record
analysis; interviews; gathering information from informants;
"controlled purchases" of drugs; utilizing undercover police
officers to infiltrate drug distribution organizations; trash
analysis; executing search warrants; and grand jury
investigations.  I have also become familiar with the practical
limitations of these techniques in penetrating organized drug
distribution operations and bringing about the successful
prosecution of all participants in such conspiracies.

4.    As a result of my training and experience, I am
familiar with the methods, routines, and practices of individuals
involved in the sale and trafficking of narcotics.  I am also
familiar with the various paraphernalia used to manufacture,
compound, process, deliver, and dispense heroin, cocaine,
marijuana, and other controlled substances.

5.    I submit this Affidavit in support of a Complaint for
Forfeiture in Rem against the real property and buildings located
at 67 Rush Street, Somerville, Massachusetts (the "Defendant
Property"), which is owned by the Giovanni Realty Trust, John
Cardillo, Trustee.

6.    I was involved in two investigations where we believe
illegal drug activity occurred on the Defendant Property.  In
2000, as part of an extensive investigation by the Special
Investigations and Narcotics Division of the Office of the

4

Massachusetts Attorney General ("OAG"), and the MSP, into drug
trafficking and distribution in Massachusetts, Assistant
Attorneys General William Bloomer and Eileen O'Brien obtained
wiretap warrants for phones, cell phones, and pagers relating to
twenty-four (24) different locations and five (5) different
vehicles.   Through these wiretaps MSP established probable cause
to believe that activities were conducted at the Defendant
Property in violation of 21 U.S.C. §§ 841, 846, and/or 856.   The
full two-hundred and thirty-one (231) page affidavit detailing
the probable cause for the search warrant for 67 Rush Street is
on file with the Somerville District Court, in <u>Commonwealth v.</u>
<u>Anthony Cardillo</u>, Docket Nos. 0010-CR-2038A; 0010-CR-2038B; and
0010-CR-2038C.

     7.   In 2001, the OAG and the MSP, along with the DEA, began
an investigation of narcotics, gaming, and firearms offenses by
certain individuals in and around the Boston area.   This
investigation revealed numerous intercepted phone calls that led
police to conduct surveillance of 67 Rush Street, Somerville,
Massachusetts.   This surveillance revealed numerous instances of
what we believe were drug transactions, in violation of 21 U.S.C.
§§ 841, 846, and/or 856, as well as a conspiracy to forge
prescriptions for controlled substances, and commit Medicare
fraud and utter the prescriptions at local pharmacies in an
effort to obtain controlled substances, in violation of

5

Massachusetts General Laws Chapter 94C, Section 40.  The full
one-hundred and forty-seven (147) page affidavit detailing the
probable cause for the search warrant for 67 Rush Street,
Somerville, Massachusetts, is on file with the Somerville
District Court, in <u>Commonwealth v. Anthony Cardillo</u>, docket
#0210-3604.  As set forth below, I have probable cause to believe
that the Defendant Property was used to facilitate illegal drug
activities.

   8.   Furthermore, throughout both investigations, and from
the amount of surveillance conducted at the Defendant Property
and at 27 Pearl Street, Somerville, the MSP determined that
Anthony Cardillo ("Anthony Cardillo" or "Cardillo") does not have
a legitimate job and has no ascertainable source of legitimate
income.  As set forth below, I have probable cause to believe
that the Defendant Property was purchased and/or improved with
proceeds accrued from illegal drug activities.

**The 2000 Investigation**

   9.   During the course of this investigation, we identified
a VoiceStream Wireless "pre-paid" cellular phone number (617)
230-7259 as routinely being utilized.  Scott Sanders ("Scott
Sanders" or "Sanders"), a suspected dealer in illegal drugs,
routinely received incoming calls from, and also placed calls to,
this number.  According to the records of VoiceStream Wireless,
the "pre-paid" cellular phone number is subscribed to by "John

6

Penta, Bethlehem, Pennsylvania." We believed that this was a
fictitious name and that the phone, in fact, was utilized by
Anthony Cardillo of 27 Pearl Street, Suite 4, Somerville,
Massachusetts. Throughout this investigation, as detailed in
Raragraphs 22-23 of this Affidavit, on August 15, 2000, we
positively identified "John Penta" as Anthony Cardillo. Cardillo
has a distinctive voice which has been readily recognizable
throughout this investigation. For purposes of this affidavit,
all interactions are referred to as from Cardillo not Penta.

    10. We first intercepted a call from (617) 230-7259 on July
12, 2000 at 8:47 a.m. On July 19, 2000, at 4:43 p.m. officers
intercepted an outgoing call from Sanders to Cardillo. In that
conversation, Cardillo stated "I could use help with that thing.
. . you want to break up and go half each?" Sanders responded
"Alright. Can we. . .can we just wait a couple days til I get
rid of this old thing I'm working on." During the same phone
call, Sanders informed Cardillo about a Somerville Police
surveillance occurring around Bay Street, and offered to show
Cardillo where and what cars were involved. We believed, based
upon our training and experience and further intercepted phone
calls between Sanders and Cardillo, that Cardillo was asking
Sanders for assistance in breaking up and distributing a quantity
of cocaine that he had. We further believed that the fact that
Cardillo would agree to go with Sanders to identify surveillance

7

vehicles used by local police was highly indicative of the
criminal nature of their relationship.

11.   On July 21, 2000, at 6:02 p.m., an outgoing call from
Sanders to Cardillo was intercepted during which Sanders inquired
if Cardillo wanted to meet with him at that time.   Cardillo
stated, "when you're ready just...maybe get it tomorrow."   Their
conversation concluded with Cardillo stating that he was just
working on the house and that he would talk to Sanders further
when he saw him.

12.   On July 22, 2000, at 5:46 p.m., an incoming call from
Cardillo (AC) to Sanders (SS) was intercepted. A portion of the
transcript of that call is set forth below:

AC   Alright, you know what I need?

SS   I have no idea.

AC   Ah

SS   Besides a million dollars.

AC   For you to go to work, and get, and that thing, 500 each
     maybe?

SS   Ah... You want to, I mean ah I have no use for it right now.
     Eventually I will.  But let me tell you something. . I'm
     ready to throw the towel in.  I'm getting so fuckin'
     depressed about everything.  Just fuckin' sickening.

AC   Alright, can you get my five or do you want to..?

SS   When, when do you want it?

8

AC    Whenever you get a chance.    Tomorrow morning, some time
      tomorrow?

SS    You got it, not a problem.

      13.    Later that evening, at 8:00 p.m., a wiretap intercepted
Cardillo's call to Sanders during which Sanders agreed to meet
him in one half hour and asked, "I'll see you at the new or the
old?"  Cardillo replied, "At the uhhh, new."  Based upon
intercepted conversations between Sanders and Cardillo, and
accompanying surveillance of meetings between Cardillo and
Sanders at "the new", we believed that "the new" refers to
Cardillo's "new" residence which was under renovation and was
believed to be the Defendant Property.  We believed, based on the
conversations from paragraphs eight through eleven, that Cardillo
and Sanders were going to meet at the Defendant Property to split
up the cocaine for both to distribute.  They were going to meet
at the "new" to "break up and go half each," referring to the
cocaine.

      14.    On July 27, 2000, at 12:58 p.m., an outgoing call from
Sanders (SS) to Cardillo (AC) was intercepted.  A portion of the
transcript of this call is set forth below:

SS: Alright.  I might have some money for ya tonight.

AC: OK.  Good.

SS: Kid called me and ah...and I don't have enough work for him
    outta that little...small job that I'm winding down...so I'm

9

gonna ah...

AC: Alright.  Good

SS: ... get him a contract...out of your labor pool.

AC: Alright.  Good.

SS: So...how are you makin' out with the job you started?

AC: Slow.  Slow.  I took a couple - 2, I think.

SS: Huh.

AC: What.

SS: Yeah, I'm hopin' this will be, you know, . . . 9 or 10.

AC: Oh, good.  Alright.

SS: So no guarantees I mean.

AC: Oh good.

15.  I believed that the conversation detailed in paragraph twelve depicted the ongoing narcotics relationship between Sanders and Cardillo.  In this instance, showing that Sanders had a cocaine customer for Cardillo to make money on and indicating that Sanders has money for Cardillo.  The term "work" is a common term utilized to describe illegal drugs, in this case, cocaine. Approximately one hour before this phone call between Sanders and Cardillo, Sanders took an order of 7 to 10 ounces of cocaine from a routine customer of his, identified as Richard Durante ("Durante").  At 7:12 p.m., Durante advised Sanders that he was heading his way.  Sanders advised Durante that he had "10 of those" and Durante indicated that he had money for "8".  At 7:35

10

p.m., surveillance officers observed Sanders meet with Durante on
Northern Avenue in Boston.  The next call from the Sanders phone,
which occurred at 7:46 p.m., was an outgoing call to Anthony
Cardillo at (617) 230-7259.

16.  On July 27, 2000, as a result of information from an
intercepted call between Sanders and Cardillo at 7:46 p.m.,
Trooper Timothy Babbin ("Trooper Babbin") went to Primo's Pizza
on Broadway in Somerville, and entered the restaurant.  There he
observed three white males, believed to be 40-45 years of age,
seated near the window of the restaurant.  One of these three was
later identified as Anthony Cardillo.  Trooper Babbin then
observed Scott Sanders arrive out front in his blue 2000 Mercury
Mountaineer bearing Massachusetts Registration No. 2703 RP.  At
that moment, Cardillo exited the restaurant and entered the front
passenger seat of Sanders' vehicle where he remained for
approximately 5 minutes before exiting the vehicle.  Sanders left
the area and Cardillo re-entered the restaurant and sat with the
other two white males.  Approximately 10 minutes later, Cardillo
and the other two white males exited the restaurant.  Cardillo
and one of the two white males then left the area in a black
Dodge Ram Pickup bearing Massachusetts Registration No. G82544
(the "Dodge Ram Pickup"), Cardillo was operating this vehicle.
Surveillance was terminated at that time.  I spoke with Trooper
Babbin shortly after this surveillance and Trooper Babbin

11

informed me that when Cardillo was in the restaurant awaiting Sanders' arrival, Cardillo's t-shirt was tucked into his pants. When Cardillo re-entered the restaurant after meeting with Sanders, Trooper Babbin noticed that Cardillo's t-shirt was now untucked and covering his waist area.

17.  Based upon these intercepted conversations, and the observations by Trooper Babbin at Primo's Pizza, we believed that Sanders conducted a sale of 10 ounces of cocaine to Durante on behalf of Cardillo and then immediately delivered the proceeds of that sale directly to Cardillo.  The conversation noted in Paragraph 14 of this Affidavit indicated that Cardillo, through Scott Sanders, had a customer for a cocaine sale.  As referred to in Paragraph 15 of this Affidavit, Sanders made a sale of 8-10 ounces of cocaine (referred to as a "contract" in Paragraph 14) to Durante.  Based upon our training and experience, what we know about the Sanders' organization and cocaine distribution enterprise, the information gathered during the course of this investigation and upon our review of intercepted communications during this past month between Sanders and Cardillo, we believed that Sanders and Cardillo, although having independent cocaine suppliers, separate from each other, communicated with each other and went to each other for specific orders of cocaine when, for whatever reason, they independently wished not to fulfill those orders.  For instance, although Sanders may have had "two on the

12

shelf", which we believed was referring to two kilograms of cocaine, he may not have wished to break those kilograms up for a smaller order. He would contact someone such as Cardillo to readily fulfill the order while also allowing Cardillo to make money off of the transaction. As detailed in an intercepted call between Sanders and Cardillo on July 19, 2000, at 4:43 p.m., Cardillo in turn asked Sanders if he wanted to "break up and go half each." Based upon the above stated information, we believed that Sanders and Cardillo were engaged in an ongoing venture distributing cocaine and that the give and take nature of this relationship was indicative of a long standing relationship between Sanders and Cardillo.

18. On August 11, 2000, at 11:02 a.m., a call between Sanders and Cardillo was intercepted during which the two discussed meeting "for an espresso." Sanders and Cardillo further talked about "work" and how stressful it was. During this phone call, Cardillo indicated that he was having "the house sided" tomorrow. We believed that this was significant as it described the Defendant Property, which we believed, based upon information set forth below, was a "stash" location or place where Cardillo stored or broke up his cocaine supply. Surveillance placed Cardillo at the Defendant Property, which is a two story residential dwelling, that, in August 2000, was unoccupied and under renovation. Surveillance checks of the

13

Defendant Property were conducted and across the front door was a banner reading "It's a Boy." Based upon intercepted conversations between Cardillo and Sanders, it was apparent that Cardillo and his girlfriend/wife had a baby boy in July or August 2000.

19. Later that same day, Trooper Brian O'Riordan ("Trooper O'Riordan") set up surveillance in the area of Café Toscana in Wellington Circle, Medford, Massachusetts. Around 1:20 p.m., Trooper O'Riordan observed Cardillo arrive in the Dodge Ram Pickup. Cardillo and Sanders then met at the doorway of the café and entered the restaurant. Approximately 20 minutes later, Cardillo and Sanders left the restaurant and parted company, but not before Cardillo retrieved an item from his Dodge Ram Pickup and handed it to Sanders, who placed it in the vehicle he was operating. According to Trooper O'Riordan, this item required both Cardillo and Sanders to carry it with both hands. Trooper O'Riordan then followed Cardillo directly back to the Defendant Property where Cardillo parked his vehicle. Trooper O'Riordan observed that the Defendant Property was a two story residence which appeared unoccupied and under renovation. As referred to previously, this residence was in the process of being sided. The interior also was in the process of renovation. We believed that this was the "new" residence that Sanders and Cardillo referred to in their intercepted conversations. An initial query

14

regarding the ownership of 67 Rush Street, Somerville, Massachusetts, listed the owner as "Beverly A. Campo"; however, later surveillance placed Cardillo at this location while work was being done on the Defendant Property, and subsequent research confirmed that Cardillo was, in fact, the owner of the Defendant Property, which he had purchased from Beverly Campo, via a Quitclaim Deed dated March 30, 2000.

20. On August 14, 2000, MSP intercepted a series of calls between Sanders and Cardillo. During these calls, we believed Sanders was advising Cardillo that he was anticipating some "work" and was inquiring about Cardillo's status. In these calls, Sanders indicated that Cardillo would have to do the work himself. We believed that Sanders was advising Cardillo that since it was in one piece, he would have to break it up himself to distribute it in smaller quantities. Cardillo indicated that he would prefer that the cocaine be in several pieces as opposed to a solid single piece. Sanders indicated he would check to see if he could get it broken up.

21. At 5:36 p.m., Cardillo called and asked Sanders, "Can we just do like uhm . . .25 cards or 20 cards or something tonight? Sanders replied, "Alright you got it." Sanders called back 3 minutes later and stated "25 of them." Cardillo replied, "Alright." Sanders asked what time would Cardillo be free. Cardillo replied that he would be available at 7:00 p.m. or

15

sooner.  At 6:47 p.m., Cardillo called Sanders to ask if he was ready, Sanders indicated "they would be here by 8:00."  They agreed to meet around 9:00 p.m.

22.  As a result of these intercepted calls, Trooper O'Riordan set up surveillance at Sanders' house at 11 Dartmouth Street, Somerville, Massachusetts.  At approximately 8:30 p.m., Trooper O'Riordan observed Cardillo, in his Dodge Ram Pickup, as he arrived at Sanders' house, where Sanders was waiting.  Within minutes, Cardillo drove from the area and was followed by this Affiant and Trooper O'Riordan, directly to the Defendant Property, where Cardillo was observed to enter the building. Approximately 5 minutes later, Cardillo exited the Defendant Property and left the area.  Approximately 15 minutes after that, Cardillo returned to the Defendant Property in his Dodge Ram Pickup, followed by a Lincoln Town Car bearing Massachusetts Registration No. 654 ZBY (the "Lincoln Town Car").  The Lincoln Town Car had been observed circling the block just prior to Cardillo's arrival.  The two vehicles parked in front of the Defendant Property; Cardillo and the unidentified white male entered the Defendant Property and remained for approximately one hour.  At 10:05 p.m., Cardillo and the white male exited the Defendant Property.  Trooper O'Riordan observed that the white male carried a garbage bag that appeared to be one quarter to one-half full and placed it in the trunk of the Lincoln Town Car;

**16**

then he and Cardillo stood on the sidewalk briefly before parting

company.  The white male left the area in the Lincoln Town Car

and Cardillo walked back inside the Defendant Property.  Within

minutes, Cardillo exited the Defendant Property and walked out of

view, down the driveway to the left of the Defendant Property.

Cardillo then returned immediately to his Dodge Ram Pickup and

left the area.  We note that there is a dumpster down the

driveway approximately 40 feet from the front of the Defendant

Property, and so it was unlikely the garbage bag the white male

placed in the trunk of the Lincoln Town Car was actually carrying

garbage.  Surveillance officers then followed Cardillo to Pearl

Street in Somerville, where he parked next to 27 Pearl Street.

Cardillo remained seated in his vehicle for several minutes.

Officers were unable to determine which residence Cardillo went

into, but did notice that he had left his vehicle.

23.  We believe, based upon the information detailed above,

that Cardillo met with Sanders at 11 Dartmouth Street to pick up

25 ounces of cocaine, the "25" that Sanders was referencing in

the conversation detailed in Paragraph 18 of this Affidavit.

Cardillo then drove directly to the Defendant Property and went

in to the residence very briefly, consistent with placing the

cocaine that he had just received from Sanders inside the

Defendant Property so as to avoid driving around with it.

Cardillo left, then returned within 15 minutes, accompanied by an

17

unidentified male, and the two entered the Defendant Property,
which appeared to be in complete disrepair inside.  The two
remained inside for approximately 1 hour before the unidentified
white male left carrying a weighted garbage bag.  This activity,
based upon our training and experience, and information set forth
in this Affidavit and previous Affidavits, is consistent with
utilizing the Defendant Property as a "stash" location or place
where the cocaine is further broken up for distribution.

    24.  Up until August 13, 2000, Cardillo was only known
through the alias "John Penta."  MSP positively identified "John
Penta" as Anthony Cardillo through calls intercepted and
surveillance from August 13, 2000 - August 15, 2000.  On August
13, 2000, at 7:35 p.m., Sanders placed an outgoing call to (617)
623-6063.  After several rings, an answering machine activated
with a female voice.  Sanders left a message.  The August 14,
2000, phone call from Sanders to Cardillo was answered by a
female, believed to be Cynthia Hughes, who was known to this
Affiant as Cardillo's girlfriend.  I have listened to this
particular conversation and compared it to the answering machine
message for phone number (617) 623-6063.  I believed that these
two voices were in fact one in the same.  According to Bell
Atlantic, this number was subscribed to by "Anthony Cardillo" and
was installed upon the premises at 27 Pearl Street, Suite 4,
Somerville, Massachusetts.  Cardillo and Hughes have parked their

**18**

vehicles in front of 27 Pearl Street.

25. On August 15, 2000, Trooper Marion Fletcher ("Trooper Fletcher") went to 27 Pearl Street. On mailbox number "4" was the name "Anthony Cardillo." As a result of this information, we obtained a Registry of Motor Vehicles image of Anthony Cardillo. This Cardillo was the only "Anthony Cardillo" listed in the RMV records as living in the Boston area. Furthermore, MSP Lieutenant Stephen Matthews ("Lieutenant Matthews"), Executive Officer at the Attorney General's Office, identified the RMV photo image of Cardillo as a person whom he had investigated in the past for narcotics violations. Trooper Babbin, who also had observed Cardillo previously during surveillance at Primo's Pizza identified the photo image of Cardillo as matching that of the subject at that surveillance. Trooper O'Riordan, who also had observed Cardillo during the course of this investigation, positively identified the subject in the RMV photo as that of the subject surveilled on several occasions meeting with Scott Sanders. Trooper O'Riordan has also had occasion to observe Cardillo closely during one particular surveillance and observed that this subject had a large scar on the left side of his face. Lieutenant Matthews has confirmed that Cardillo does in fact have a large scar on the left side of his face. From this information, we determined that "John Penta" was, in fact, Anthony Cardillo.

19

26.  On August 15, 2000, at 8:50 a.m., the wiretap intercepted a call from Sanders to Cardillo, during which Sanders stated that he had "some paperwork" for Cardillo.  As was stated previously, we believed "paperwork" to be a code word for cocaine.  The two then agreed to meet in 10 minutes at "the new," which our investigation determined to be the Defendant Property. Approximately 10 minutes later, Trooper Paul Bulman ("Trooper Bulman") observed Cardillo and Sanders at the Defendant Property. The two met briefly before leaving the area.  Based on our training and experience, and the manner in which the meeting took place, we believed that a drug transaction occurred between Cardillo and Sanders at the Defendant Property during this meeting.

27.  Based upon this information and other information contained in the Affidavit of Trooper Peter C. Cummings and the Affidavit of this Affiant, on August 15, 2000, Justice Carol S. Ball of the Massachusetts Superior Court issued a search warrant for 67 Rush Street, Somerville, Massachusetts, and for 27 Pearl Street, Somerville, Massachusetts, along with 22 other locations and 5 vehicles.

28.  Pursuant to these warrants, a search was conducted on August 16, 2000, at the Defendant Property.  As a result of this search, officers found 23 pounds of marijuana, 1975.38 grams of Percocets, 1 large box of zip lock bags, 1 scale, and personal