paperwork in the name of Anthony Cardillo.

29. When officers executed the search warrant at 27 Pearl Street, Somerville, they found Cardillo in the process of flushing a large amount of cocaine down a toilet. Officers also found $128,295 in United States Currency during this search. Cardillo was arrested and indicted in Massachusetts State Court for trafficking Oxycodone over 200 grams; possession of marijuana with intent to distribute; and conspiracy to violate the Massachusetts Controlled Substances Act. Cardillo was then released after posting $50,000 cash bail on the day of his arraignment.

30. Finally, on December 15, 2000, after indictments were issued by the Middlesex County Grand Jury, Anthony J. Cardillo was arraigned in Middlesex Superior Court on the following charges: 1) Trafficking in a Class B Controlled Substance (cocaine) Over 200 grams; 2) Trafficking in a Derivative of Opium (oxycodone) Over 200 grams; 3) Possession with the Intent to Distribute a Class D Controlled Substance (marijuana); and, 4) Conspiracy to Violate the Controlled Substance Act.

**The 2002 Investigation**

31. In late September of 2002, through an investigation into narcotics and gaming activities, a confidential informant ("CI") arranged with an individual identified as Anthony Rizzo ("Rizzo") to purchase nine ounces of cocaine for a price of $1000

per ounce. On September 22, 2002, the CI participated in a controlled purchase of four ounces of cocaine from Rizzo and an individual identified as Andrew Arinello ("Arinello") in the North End. The DEA field tested the cocaine with positive results. The CI arranged further controlled purchases from Rizzo and Arinello on October 1, 2002, and October 31, 2002. On October 30, 2002, the CI met with Rizzo and arranged to purchase two ounces of cocaine from Rizzo on the following day. Rizzo told the CI that he had "one guy" that Rizzo trusted. Shortly after this meeting, a wiretap intercepted a call from Rizzo to Anthony Cardillo to arrange the October 31, 2002 buy. Surveillance indicated Cardillo now lived at the Defendant Property.

32. On November 20, 2002, the CI met Rizzo and Paolo Tizzano (whom the CI had purchased oxycontin pills from on two prior occasions) at the Corner Café in Boston and arranged to buy two more ounces of cocaine on Friday, November 22, 2002.

33. On November 22, 2002, Rizzo spoke to Cardillo on the telephone and said "I need 200." Rizzo said he would replace it. Cardillo said it would be no problem. Based on our training, experience and previously intercepted phone calls, we believed that this call related to Cardillo providing the two ounces of cocaine for the sale to the CI. On the same day, Cardillo met with Arinello at Mike's Donuts in Everett, Massachusetts. We

believed at this meeting Anthony Cardillo delivered two ounces of cocaine to Arinello. Surveillance officers observed Cardillo arriving at the Defendant Property approximately 10 minutes after this meeting.

34. On November 26, 2002, Troopers Fletcher, Babbin, and Gregg DesFosses set up surveillance of the Defendant Property after intercepting a wiretap call between Cardillo and Wilberto Pagan ("Pagan"), believed to be one of Cardillo's cocaine suppliers, referencing arrangements to meet at Cardillo's house in 30 minutes. At approximately 5:25 p.m., Pagan arrived at the Defendant Property in a White Volkswagan Jetta, Massachusetts Registration No. 19Kl08 (the "white Jetta"). Pagan entered the house and stayed until 6:03 p.m.

35. Pagan also arranged to meet Cardillo at the Defendant Property on November 27, 2002. Trooper Smith followed Pagan from 383 Salem Street, Medford, Massachusetts, to the Defendant Property, where Pagan greeted Cardillo and entered the Defendant Property at approximately 11:40 a.m. Later that same day, at approximately 3:20 p.m., a wiretap intercepted a call from Joseph Arruda ("Arruda") to Cardillo. Arruda informed Cardillo he would be going to a party that night and asked Cardillo if "you think you could do what you did the other day?" Cardillo responded "I already know what you're talking about," and made arrangements to meet at the Defendant Property. Upon receiving this information,

surveillance was set up at the Defendant Property. At approximately 4:10 p.m., Trooper O'Riordan saw Cardillo arrive at the Defendant Property. Within one minute, Arruda arrived at the Defendant Property in a maroon BMW. Cardillo then walked to the rear of Trooper O'Riordan's unmarked cruiser and appeared to copy down the license plate of the unmarked cruiser. Trooper Michael Smith ("Trooper Smith") observed both men then return to and enter the Defendant Property. Troopers O'Riordan and Smith then left the area. Trooper Smith was able to identify Arruda from a Registry of Motor Vehicles photo. We believed that the subject of the meeting was narcotics, and that Arruda purchased narcotics while at the Defendant Property.

36. On November 28, 2002, at approximately 10:30 a.m., a wiretap intercepted a call from Pagan to Cardillo. In the call, Cardillo stated "that thing you got, don't break it." Pagan asked if Cardillo wanted it and Cardillo said he wanted it "nice" and "one". Cardillo said, "Make sure it's together." Pagan asked Cardillo if he wanted "it" today. Cardillo said he was going out and said he'd prefer the next day.

37. Based on my training and experience, I know that high-level cocaine distributors often sell their product in large quantity packages, including kilogram packages. I believe that Cardillo was telling Pagan that he wanted a complete package, not to break up the kilogram of cocaine into smaller packages.

24

38. The next day, November 29, 2002, Pagan called Cardillo and arranged to meet him at 5 p.m. At approximately 4:30 p.m., Troopers Fletcher and Smith set up surveillance in the area of Pagan's residence at 383 Salem Street in Medford. At approximately 4:55 p.m., Trooper Fletcher saw Pagan exit his residence and get into the white Jetta. Pagan stayed inside the car for a few moments and appeared to be adjusting something inside the car before backing out of the driveway. Trooper Fletcher followed Pagan continuously to the Defendant Property. Within seconds of Pagan's arrival at the Defendant Property, Cardillo came out of the house carrying a trash bag and began to look up and down the street. Cardillo then walked down the side of the house, toward the rear of the Defendant Property, and place the trash bag in the trash area of the Defendant Property. Trooper Smith saw Pagan leave the Defendant Property at approximately 5:10 p.m. Pagan appeared to conduct counter-surveillance efforts when he left the area, stopping and carefully observing the traffic in his area. Based on the Troopers' training and experience, as well as the prior day's intercepted calls referencing not "breaking it up" and "keeping it whole," they believed that Pagan delivered a one kilogram package of cocaine to Cardillo at the Defendant Property during this meeting.

39. On December 1, 2002, at approximately 11:33 a.m., a

wiretap intercepted a call by Pagan to Cardillo. In that conversation, Cardillo asked Pagan when he would be around. Pagan asked, "You got the ticket now?" Cardillo said yes. Pagan said he wanted to come over and talk. Cardillo said, "I'll give you the ticket for the other thing." The men agreed to meet at 12:20 p.m. Based on our training and experience, it is common for narcotics distributors to refer to a package of cocaine as a "ticket". At approximately 12:00 p.m., surveillance officers saw Pagan leave the driveway of his residence in his white Jetta and drive in the direction of Somerville. Surveillance officers temporarily lost sight of Pagan, and went to the area of 67 Rush Street in Somerville. Pagan arrived at the Defendant Property and went inside.

40. At approximately 1:19 p.m. that same day, a wiretap intercepted a call by Cardillo to Frank Coscarelli ("Coscarelli"). While the phone was ringing, Cardillo can be overheard talking to Pagan in the background, stating "twenty-five??!! You chiseling cocksucker...you're worse than I am." Pagan replied, "Do you got a lot of it?" Cardillo responded, "I don't know, I gotta ask the kid." When Coscarelli answered the phone, Cardillo asked if he can "come by and pick up one of those books?" The men agreed that Cardillo would go by in five to ten minutes. Based upon our training and experience, we believed the subject of this conversation was narcotics. Cardillo cited 25,

26

and voiced his opinion that the price was too high. We believed this suggests that Pagan was requesting a price of $25,000, consistent with the low-level price of a kilogram of cocaine in the Boston area. We further believed that the "book" was in reference to a package of cocaine, the "ticket" that Pagan stopped by to pick up. We were unable to conduct surveillance of Cardillo as he met with Coscarelli due to Cardillo's counter-surveillance efforts.

41. At approximately 4:17 p.m. that same day, a wiretap intercepted another call from Pagan to Cardillo. Pagan repeatedly said "no" and that his friends didn't like "it." We believed this call indicated that Cardillo picked up the "book," believed to be cocaine, and provided it to Pagan to show to his "friends." The conversation further indicates that the "friends" did not like the quality of the "book" and that Pagan offered to return it to Cardillo that night. Cardillo advised Pagan that he would see him on the following day.

42. The next day, December 2, 2002, a wiretap intercepted a call from Pagan to Cardillo where Cardillo stated he wanted Pagan to "come by and get that thing." Pagan begrudgingly agreed to come over.

43. The wiretap intercepted calls between Pagan and Cardillo on almost a daily basis. We believed that calls intercepted on December 4, 2002, at 7:47 p.m., and December 5,

2002, at 10:19 a.m. provide further indications that Pagan supplied Cardillo with an unspecified amount of suspected cocaine.

44.  On December 11, 2002, at 9:00 a.m., Pagan contacted Cardillo.  Cardillo informed Pagan that he had "ten" for Pagan.  Pagan replied that he would be by Cardillo's house in 35 minutes.  Based on our training and experience, it is our opinion that the purpose of the meeting was for Pagan to collect $10,000.

45.  On December 12, 2002, after setting up surveillance of Pagan's residence at 383 Salem Street, Medford, Trooper Fletcher observed Pagan as he exited the rear of his residence.  Trooper Fletcher observed as Pagan then went to the trunk of a 2001 green Volkswagen Jetta, bearing Massachusetts Registration No. 1882 RR, and retrieved a white shopping bag which appeared to be weighted down by rectangular shaped objects within.  Pagan then walked over to a red Toyota Camry, bearing Massachusetts Registration No. 19LX09 (the "Toyota Camry"), placed the bag inside the Toyota Camry and then drove the Toyota Camry to the Defendant Property, where surveillance officers observed him entering the Defendant Property carrying the white shopping bag.  Approximately 10 minutes later, Pagan exited the Defendant Property without the white shopping bag.

**Prescription Forgery Investigation**

46.  In addition to what we believed were drug transactions,

intercepted phone calls from Cardillo to Christina Gaudin ("Gaudin") indicate an ongoing scheme to pass forged prescriptions at pharmacies. On November 22, 2002, at approximately 5:23 p.m., the wiretap intercepted a call from Cardillo to (781) 284-7941, a residential telephone subscribed to Anthony Coppola at 58 Arcadia Street, Revere, Massachusetts. Gaudin answered the phone "Dr. Rosenbaum's Office, please hold." We later learned that Gaudin worked at a dentist's office. During the conversation, Gaudin offered to "write it out a different way." We believed this statement is evidence that Gaudin had gained improper access to prescription pads and was assisting Cardillo with obtaining controlled substances by forging prescriptions. In our experience, pharmacies often check with the office of the prescribing doctor before filling a prescription, a safeguard against fraud. Gaudin would be able to defeat this safeguard if the pharmacy called her number.

47. On November 25, 2002, at approximately 5:10 p.m., the wiretap intercepted a call from Cardillo to Gaudin. Gaudin answered the phone "Doctor Rosenbaum's office." Gaudin told Cardillo she had something to tell him but could not tell him over the phone. They agreed to meet at the Defendant Property at 6:30 p.m. Based on this information, Trooper Fletcher set up surveillance at the Defendant Property. At approximately 6:44 p.m., Trooper Fletcher saw Gaudin arrive at the Defendant

Property driving a white 1991 Infinity G20, bearing Massachusetts Registration No. 487YBX, and enter the Defendant Property. Gaudin left the Defendant Property at approximately 6:52 p.m., with Cardillo.

48. The wiretap intercepted several more conversations between Cardillo and Gaudin on November 22, November 25, November 26, and November 28, 2002. We believe that each of the calls were in reference to the prescription scheme.

49. Based upon this information, on December 18, 2002, we applied for and received a Massachusetts State Search Warrant to search 67 Rush Street, Somerville, Massachusetts. During the search we recovered the following drug-related items and paraphernalia: $5,000 in U.S. currency located in a kitchen cabinet; $6,138 in U.S. currency located in the main bedroom nightstand; 1 Nokia cellular telephone number (617) 605-9953 in the main bedroom nightstand; black leather fold containing numerous business cards, phone numbers, notations etc. in the main bedroom nightstand; various paperwork in the kitchen in the name of Anthony Cardillo, including banking records, phone records, photographs and keys; various files pertaining to taxes, bank records, investment records, property records, etc., in the file cabinet in the main bedroom; and one (1) clear plastic baggie containing white rock/powder in the family room off of kitchen on a windowsill.

50. For the reasons set forth above, I have probable cause to believe that the Defendant Property is subject to forfeiture. In both of the investigations surrounding the illegal narcotics activities of Cardillo, and others, there were numerous instances where surveillance indicated the Defendant Property was used as a "stash house" to store illegal drugs, believed to be cocaine, subjecting the Defendant Property to forfeiture pursuant to 21 U.S.C. § 881(a)(7). Additionally, a search of the Defendant Property pursuant to the Massachusetts State Search Warrant on August 16, 2000, found 23 pounds of marijuana and 1,975.38 grams of Percocets. Furthermore, I have probable cause to believe that funds used to purchase and/or improve Defendant Property were accrued from illegal drug activities, subjecting the Defendant Property to forfeiture pursuant to 21 U.S.C. § 881(a)(6). Throughout both investigations, MSP determined that Anthony Cardillo does not have a legitimate job and has no ascertainable source of legitimate income, yet he was able to finance the purchase and complete renovation of Defendant Property.

Signed under pains and penalties of perjury this 12th day of April, 2004.

_____
Trooper Brian P. Connors
Massachusetts State Police

**EXHIBIT B**

**AFFIDAVIT OF JAMES O'HARA**

I, James O'Hara, state the following under oath:

1.  I am a Special Agent of the United States Drug Enforcement Administration (the "DEA"). I joined the DEA in 1984, when I was assigned to the New York City Office. I was transferred to the New England Field Division in 1989. For the past three years, I have been assigned to the Asset Forfeiture Section of the DEA.

2.  As a DEA Special Agent, I have participated in approximately 50 investigations relating to the distribution and the sale of controlled substances such as cocaine, heroin, and marijuana, and am familiar with the methods, routines, and practices of narcotics traffickers. I am also familiar with the various paraphernalia used to manufacture, compound, process, deliver, and dispense heroin, cocaine, marijuana, and other controlled substances.

3.  In the course of my work I have utilized various investigatory tools and techniques, including confidential informants, cooperating witnesses, undercover agents, physical surveillance, search warrants, telephone toll analysis, court-authorized electronic surveillance, grand jury investigations, and witness interviews. I previously have submitted affidavits in conjunction with applications requesting authorization to conduct searches and seizures in connection with drug

investigations.

4.  Based upon my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage, and transportation of narcotics and the collection of money that constitutes the proceeds of narcotics trafficking activities. Among other things, I am familiar with: the manner in which narcotics traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute narcotics and the proceeds of narcotics trafficking; the manner in which narcotics traffickers use telephones, coded or slang-filled telephone conversations, pagers, coded pager messages, and other means to facilitate their illegal activities; the vernacular of users and distributors of controlled substances and the methods by which such persons attempt to disguise the subjects of their conversations and operations; and the typical price, packaging, and method of sale of narcotics in many parts of the country, including eastern Massachusetts.

5.  I submit this Affidavit in support of a Complaint for Forfeiture in Rem (the "Complaint") against the real property, including all buildings and appurtenances, located at 67 Rush Street, Somerville, Massachusetts ("the Defendant Property"), which is owned by the Giovanni Realty Trust, John Cardillo, Trustee.

6.  This affidavit is based on an investigation conducted

by the Massachusetts State Police ("MSP") in conjunction with the Special Investigations and Narcotics Division of the Office of the Massachusetts Attorney General, which began in approximately July of 2000. As a result of this investigation, members of the MSP executed two separate searches of the Defendant Property. The first search, pursuant to a Search Warrant issued by Justice Carol S. Ball of the Massachusetts Superior Court, took place on or about August 16, 2000. The second search, pursuant to a Search Warrant issued by the Falmouth District Court, took place on or about December 18, 2002. Details of both of these searches, along with the investigation of Anthony Cardillo and his illegal narcotics activities involving the Defendant Property are more fully described in the Affidavit of MSP Trooper Brian P. Connors ("Trooper Connors"), which is attached to the Complaint as Exhibit A.

7. Based on the information detailed in the Affidavit of MSP Trooper Connors, which I have reviewed, I have probable cause to believe that the Defendant Property was used or intended to be used to commit, or to facilitate the commission of, a violation of Title 21, United States Code, Sections 841 and/or 846. I therefore have probable cause to believe that the Defendant Property is subject to forfeiture to the United States pursuant to 21 U.S.C. §§ 881(a)(6) and 881(a)(7).

Signed under the pains and penalties of perjury this 13 day of April 2004.

_____
James O'Hara, Special Agent
United States Drug Enforcement
Administration

N:\LTalbot\wright\67 Rush Street\O'Hara Affidavit1.wpd